IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| WILLIAM STUART ANAPOELL, M.D., on behalf of himself and others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>AMERICAN EXPRESS BUSINESS FINANCE CORPORATION, a Utah corporation, and KEY EQUIPMENT FINANCE, INC., a Michigan corporation,<br><br>Defendants. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br>Case No. 2:07-CV-198-TC |

This matter comes before the court on the Defendants' motions to dismiss the Plaintiff's claims under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. In this proposed class action suit,[1] Dr. William Anapoell alleges in his First Amended Complaint that the Defendants, who lease medical equipment, have fraudulently imposed charges on their equipment-leasing customers in violation of lease contract language, tort law, the Utah Uniform Commercial Code (UCC), and unfair practices statutes in Utah and California.

For the reasons set forth below, the court finds that Dr. Anapoell fails to state a claim for which relief can be granted as to his causes of action for intentional misrepresentation, fraudulent

---

[1]No motion to certify any class has been filed with the court, so no class has been approved.

concealment, negligent misrepresentation, conversion, unjust enrichment, violation of the Utah

Unfair Practices Act, violation of UCC § 70A-2A-218(5), and violation of California Business &

Professions Code § 17200 et seq., and so the court dismisses those claims with prejudice.  As for

his remaining claims—breach of contract and breach of the implied covenant of good faith and

fair dealing—the court finds that he has not stated his claims with the necessary definiteness, so

the court dismisses those causes of action without prejudice and grants Dr. Anapoell leave to file

a motion to amend his complaint as to those two claims.[2]

## BACKGROUND[3]

On February 18, 2004, Plaintiff William Anapoell, M.D., entered into a lease for medical

equipment with Defendant American Express Business Finance Corporation ("AmEx").  That

lease transaction was documented by the Master Lease Agreement, the Equipment Schedule to

the Master Lease Agreement, and the Purchase Order (collectively "Agreement").[4]  On October

---

[2]Defendant American Express Business Finance ("AmEx") requests that the court strike Dr. Anapoell's jury trial demand.  (See AmEx's Mem. Supp. Mot. Dismiss at 3 n.3 ("AEBF objects to plaintiff's jury trial demand and hereby moves to strike said demand in the event AEBF's Motion to Dismiss is not granted in its entirety.").)  Because the court's ruling leaves room for Dr. Anapoell to revive two claims, technically the jury trial issue is not moot.  But the court denies AmEx's request at this point, albeit without prejudice.  If a motion for leave to amend is filed by Dr. Anapoell and granted by the court, the Defendants will be free to file a formal motion regarding the jury trial issue.

[3]The background facts are taken from Dr. Anapoell's First Amended Complaint and are taken as true for purposes of this order only.  See Tal v. Hogan, 453 F.3d 1244, 1252 (2006), cert. denied, 127 S. Ct. 1334 (2007) (on motion to dismiss, well-pleaded factual allegations in complaint are taken as true for purpose of analysis).

[4]While Dr. Anapoell did not attach a copy of the lease documents to his First Amended Complaint, where a written contract is referred to in a complaint and is central to a breach of contract claim, but is not submitted for judicial review, an indisputably authentic copy of the contract may be considered on a motion to dismiss.  GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir. 1997).  Accordingly, the court considers the lease

22, 2004, Defendant Key Equipment Finance, Inc. ("Key") assumed AmEx's lease with Dr. Anapoell when it acquired the equipment leasing portfolio of AmEx.

In the Agreement, the parties agreed that "[T]his Master Lease Agreement and each Lease shall be deemed entered into and performed in Salt Lake County, Utah.  EACH LEASE SHALL BE GOVERNED BY THE LAWS OF UTAH, WITHOUT REGARD TO ITS PRINCIPLES OF CONFLICTS OF LAW OR CHOICE OF LAW."  (Master Lease Agreement (attached as Ex. A to AmEx's Mem. Supp. Mot. Dismiss) ¶ 16 (emphasis in original).)   The Agreement also contains a provision requiring that the leased medical equipment be insured.  That provision reads:

> **Insurance; Indemnification:**
>
> Lessee shall at all times maintain liability, fire, damage, casualty (covering death and personal injury) and theft insurance on the Equipment in amounts and with insurers acceptable to Lessor, and shall list Lessor and each Assignee as an additional and loss payee thereon.  Such insurance policies shall require the insurer to provide Lessor with at least 30 days prior written notice of any material change in or cancellation of such insurance.  <u>In the event that Lessor determines that any such insurance is not in effect, Lessor may (but shall not be required to) obtain such insurance at Lessee's expense.</u>

(<u>Id.</u> ¶ 8 (emphasis added) [hereinafter "Insurance Provision"].)  And last, but not least, the Agreement provides that "LESSEE WAIVES ANY AND ALL RIGHTS AND REMEDIES OTHERWISE GRANTED TO LESSEE BY [Utah Uniform Commercial Code (UCC)] §§ 52A-508 THROUGH 2A-522."  (<u>Id.</u> ¶ 9 (emphasis in original).)

Although the Insurance Provision gave Dr. Anapoell the option to purchase insurance on

---

documents to be part of the First Amended Complaint, and it need not convert the Defendants' motions to dismiss to motions for summary judgment.  <u>Id.</u>

his own, he did not do so.  Accordingly, AmEx obtained insurance for the equipment leased by

Dr. Anapoell and sent Dr. Anapoell monthly invoices for the following charges: $157.35 for

Property Insurance and $90.48 for Liability Insurance, for a total of $247.83 per month.  (After

Key acquired the lease from AmEx, Key sent the same monthly invoices to Dr. Anapoell.)

Dr. Anapoell paid the monthly invoices.  But now he alleges that "[t]he charges were

more than Defendants' expense to obtain insurance coverage . . . ."  (First Am. Compl. ¶ 33.)

Indeed, he alleges that "Defendants have concealed and suppressed from all of their customers

and members of the public the true fact that Defendants are not actually imposing charges only

for insurance coverage, and that the charge bears no correlation or reasonable relationship to any

contractual obligation of its customers or the cost of insurance coverage."  (Id. ¶ 22; see also id.

¶ 21.)  He further alleges that "Defendants' insurance charge . . . includes amounts other than for

coverage obtained by Defendants, in that Defendants retain a part of the insurance charge as a

service fee and/or interest, or Defendants . . . receive payments from insurance agents or

insurance companies under the guise of reinsurance cessations, service fees, commissions or

rebates."[5]  (Id. ¶ 19.)

Based on the above, Dr. Anapoell asserts breach of contract claims.  But he takes his

allegations a step further by also asserting claims for various torts (including fraud), violation of

unfair business practice statutes in Utah and California, and violation of the UCC.  According to

_____

[5]The court does not understand how Defendants' alleged receipt of "payments from
insurance agents or insurance companies under the guise of reinsurance cessations, service fees,
commissions or rebates" ties into Dr. Anapoell's allegation that he was overcharged for
insurance.  Perhaps this allegation is more relevant to Dr. Anapoell's claim under his Unfair
Trade Practices Act cause of action that the Defendants are acting as insurers or sellers of
insurance.  (See First Am. Compl. ¶ 84.)

Dr. Anapoell, "[t]he entire scheme and artifice was engineered and practiced by Defendants so as to charge the customer a fee separate from the charges for the equipment, for which there was no actual corresponding cost, thereby increasing the profits made by the Defendants.  In fact, the charges are intentionally kept small so as not to generate inquiries or complaints from customers but are applied so as to cumulatively generate huge profits for the Defendants."  (Id. ¶ 23.)

He brings his claims on behalf of himself as well as a proposed national class and a proposed subclass of similarly situated persons in California (for whom he alleges violation of the California Business and Professions Code § 17200).  He originally filed his suit in the United States District Court for the Southern District of California.  The federal court in California ruled that venue was improper (based on a valid forum selection clause in the Agreement) and transferred the case to this court.

Then Dr. Anapoell filed his First Amended Complaint here, asserting ten causes of action: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) intentional misrepresentation; (4) fraudulent concealment; (5) negligent misrepresentation; (6) conversion; (7) unjust enrichment; (8) violation of the Utah Unfair Practices Act; (9) violation of UCC § 70A-2A-218(5); and (10) violation of California Business and Professions Code § 17200 et seq., through unlawful, unfair, and fraudulent business practices.  Defendants now bring motions to dismiss the entire First Amended Complaint on the basis that Dr. Anapoell has not alleged claims upon which the court may grant relief and that his fraud allegations do not meet the heightened pleading standard required by Federal Rule of Civil Procedure 9(b).

# ANALYSIS

## Standard of Review

When reviewing a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief may be granted, the court must presume the truth of all well-pleaded facts in the complaint, but need not consider conclusory allegations. Tal v. Hogan, 453 F.3d 1244, 1252 (2006), cert. denied, 127 S. Ct. 1334 (2007); Mitchell v. King, 537 F.2d 385, 386 (10th Cir. 1976). The court is not bound by a complaint's legal conclusions, deductions and opinions couched as facts. Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964-65 (2007). But all reasonable inferences must be drawn in the non-moving party's favor. Tal, 453 F.3d at 1252.

As for claims of fraud, the plaintiff must plead the circumstances constituting fraud with particularity, although "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed. R. Civ. P. Rule 9(b). To meet the heightened pleading standard of Rule 9(b), the "complaint alleging fraud must set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." Tal, 453 F.3d at 1263 (internal quotations omitted).

## The Contract Claims

Dr. Anapoell asserts a cause of action for breach of contract and a cause of action for breach of the implied covenant of good faith and fair dealing. The court will address each in turn.

### Breach of Contract

Dr. Anapoell contends that the Defendants breached the Insurance Provision of the Agreement. That provisions reads, in relevant part, as follows: "In the event that Lessor

determines that any such insurance is not in effect, Lessor may (but shall not be required to) obtain such insurance at Lessee's expense." (Master Lease Agreement ¶ 8 (emphasis added).)

Dr. Anapoell contends that the Defendants breached the Agreement by charging more for the cost of obtaining the insurance than was allowed under the Insurance Provision of the Agreement.[6]  He says, "Defendants have contracted to only charge for insurance coverage, but have breached this contract by charging far more." (First Am. Compl. ¶ 1.)  But nothing in the Agreement specifically prescribes the amount the Defendants could charge the lessee.  Nor does the Agreement limit the Defendants to charging the lessee for the amount of the insurance premium only and not related expenses, such as the cost of obtaining the insurance coverage.

Dr. Anapoell interprets the language to include a limitation on what the Defendants could charge the lessee.  But his legal interpretation is not entitled to any deference.  Only well-pleaded facts are assumed to be true for purposes of deciding a motion to dismiss.  And, in a nutshell, this is what he pleads:

- "Defendants have concealed and suppressed from all of their customers and members of the public the true fact that Defendants are not actually imposing charges only for insurance coverage, and that the charge bears no correlation or reasonable relationship to any contractual obligation of its customers or the cost of insurance coverage." (First Am. Compl. ¶ 22; see also id. ¶ 21.)

---

[6]It is unclear whether Dr. Anapoell claims that the Defendants were limited to charging the premium of the insurance, or whether they were limited to charging the premium of the insurance as well as reasonable costs to obtain that insurance.  For purpose of analysis, the court reads Dr. Anapoell's complaint to allege that the Defendants charged not only the insurance premium and costs to obtain the insurance, but also surreptitiously charged an amount that was purely profit and not related to the cost of obtaining the insurance.

- "Defendants' insurance charge . . . includes amounts other than for coverage obtained by Defendants, in that Defendants retain a part of the insurance charge as a service fee and/or interest . . . ." (Id. ¶ 19.)

- "Defendants sent standardized form invoices to Anapoell that included two charges for insurance, in the amounts of $157.35 for Property Insurance and $90.48 for Liability Insurance, for a total of $247.83 per month.  The charges were more than Defendants' expense to obtain insurance coverage . . . ." (Id. ¶ 33.)

- "Anapoell paid the insurance charges for a time, not knowing that they were grossly excessive." (Id. ¶ 34.)

Given the silence of the Agreement regarding the amount Defendants could charge, the court simply cannot find that Dr. Anapoell has stated a claim for breach of contract with the vague and conclusory allegations he provides.  The court dismisses his claim, but without prejudice.  To the extent he can validly allege a breach with more definiteness, then the court will consider granting leave to amend.

### Breach of the Implied Covenant of Good Faith and Fair Dealing

Dr. Anapoell also asserts a cause of action for breach of the implied covenant of good faith and fair dealing.  Utah[7] recognizes the existence of such an implied covenant in all

---

[7]This court applies Utah law to the contract claims based on the choice of law provision in the Agreement.  (See Master Lease Agreement ¶ 16 ("EACH LEASE SHALL BE GOVERNED BY THE LAWS OF UTAH, WITHOUT REGARD TO ITS PRINCIPLES OF CONFLICTS OF LAW OR CHOICE OF LAW.") (emphasis in original).)  Furthermore, the court has diversity jurisdiction.  Accordingly, absent a conflict of law issue, Utah law applies to non-contract claims.  See, e.g., Clark v. State Farm Mut. Auto. Ins. Co., 433 F.3d 703, 709 (10th Cir. 2005) (stating rule that substantive law of forum in which court sits applies when the court is exercising diversity jurisdiction).

contracts.  <u>Prince v. Bear River Mut. Ins. Co.</u>, 56 P.3d 524, 553 (Utah 2002).

> Under this covenant, the contracting parties each impliedly promise not to intentionally or purposely do anything that will destroy or injure the other party's right to receive the fruits of the contract . . . .  [T]o comply with the covenant, a party must act consistently with the agreed common purpose and the justified expectations of the other party.

<u>Id.</u> (internal citations and quotation marks omitted).  But the covenant is not without limitation. It does not "establish new, independent rights or duties not agreed upon by the parties," and it may not be used to "nullify a right granted by a contract to one of the parties."  <u>Wood v. Utah Farm Bureau Ins. Co.</u>, 19 P.3d 392, 399 (Utah Ct. App. 2001) (quoting <u>Brehany v. Nordstrom, Inc.</u>, 812 P.2d 49, 55 (Utah 1991)).

Dr. Anapoell's claim rests essentially on the same facts alleged in his claim for breach of contract.  That is, he alleges that the implied covenant was breached because the Defendants charged amounts grossly in excess of the Defendants' cost to obtain the necessary insurance.

The Defendants contend that his claim for breach of the implied covenant does not present facts separate from his breach of contract claim and so it must be dismissed because it is redundant.  They cite to <u>Canopy Corp. v. Symantec Corp.</u>, 395 F. Supp. 2d 1103 (D. Utah 2005), to support their contention.

In <u>Canopy</u>, the court found that the implied covenant claim relied upon a set of facts that related only to the party's termination of the contract, which the court found could "be redressed by the breach of contract claim."  <u>Id.</u> at 1111.  <u>Canopy</u> is distinguishable.  As the <u>Canopy</u> court noted, "[t]o state a separate claim [for breach of the implied covenant of good faith and fair dealing], [the plaintiff] must demonstrate some implied promise separate from a breach of the [contract's provision.]" <u>Id.</u>  In this case, Dr. Anapoell alleges, albeit in a conclusory and vague

fashion, that the Defendants charged amounts that were "grossly excessive" of the Defendants'

cost to obtain insurance.  This could be read to mean that Defendants had to charge reasonable

amounts under the Insurance Provision but did not do so.

Still, Dr. Anapoell's complaint is not plead in terms definite enough to survive a motion

to dismiss.  As was done for the breach of contract claim, the court dismisses the implied

covenant claim without prejudice.  Dr. Anapoell may file a motion for leave to amend his claim

for breach of the implied covenant, but any new set of factual allegations must demonstrate

breach of an implied promise that does not establish a new right under the written contract.  See,

e.g., Malibu Inv. Co. v. Sparks, 996 P.2d 1043, 1048 (Utah 2000) (implied covenant shall not be

interpreted to make a better deal for the party than he made for himself).  His current allegations,

which do not contain any detail concerning his claim,[8] are simply too vague and conclusory to

satisfy his pleading burden.

**Unjust Enrichment Claim**

Unjust enrichment[9] is only available as an equitable remedy where one does not exist at

law.  "If a legal remedy is available, such as breach of an express contract, the law will not imply

the equitable remedy of unjust enrichment."  American Towers Owners Ass'n, Inc. v. CCI

Mech., Inc., 930 P.2d 1182, 1193 (Utah 1996).

---

[8]Dr. Anapoell's attempt to "clarify" his pleadings, as noted in his opposition to the
Defendants' motions to dismiss (see Pl.'s Opp'n to Key's Mot. to Dismiss at 7 n.1), does not
assist him here.  The court only looks to the allegations in the complaint.

[9]Recovery for unjust enrichment requires "(1) [that] a benefit was conferred on one
person by another; (2) an appreciation or knowledge by the conferee of the benefit; and (3) the
acceptance or retention of the benefit under such circumstances as to make it inequitable for the
conferee to retain the benefit without payment of its value."  American Towers Owners Ass'n,
Inc. v. CCI Mech., Inc., 930 P.2d 1182, 1192 (Utah 1996).

In this case, there is no dispute that a valid enforceable contract exists, and that such contract covers the subject matter of the litigation.  Indeed, Dr. Anapoell alleges unjust enrichment based on conduct that arose because the Insurance Provision of the Agreement exists. For example, he states that "Plaintiff and class members have conferred a benefit on Defendants by paying charges in excess of and unrelated to the expense of insurance."  (First Am. Compl. ¶ 78.)  Because a legal remedy (that is, breach of contract) exists and is being asserted by Dr. Anapoell in the same complaint, the unjust enrichment claim fails as a matter of law.  "Recovery under [a claim of unjust enrichment] presupposes that no enforceable written or oral contract exists." American Towers, 930 P.2d at 1193 (internal quotations and citation omitted).

Dr. Anapoell contends that if his breach of contract claim fails, then he is entitled to assert a claim of unjust enrichment as an alternative theory of recovery.  This is an incorrect statement of the law.  The issue is not whether he has a valid breach of contract claim, but whether an enforceable contract exists that provides the possibility of a legal remedy.  Unjust enrichment affords relief to a party that has been harmed outside the context of a contractual relationship.  See Woods v. Utah Farm Bureau Ins. Co., 19 P.3d 392, 396 (Utah Ct. App. 2001) (dismissing unjust enrichment claim where express contract existed).

For the foregoing reasons, the court dismisses his unjust enrichment claim.

**The Tort Claims and the Economic Loss Doctrine**

The Defendants contend that the economic loss doctrine compels dismissal of Dr. Anapoell's claims for intentional misrepresentation, fraudulent concealment, negligent misrepresentation, and conversion.  In Utah, the economic loss doctrine bars all tort claims seeking recovery for economic losses when the claims are not based on a duty independent of the

11

contractual obligations between the parties.[10]  See Grynberg v. Questar Pipeline Co., 70 P.3d 1,

11, 13 (Utah 2003) (rejecting argument that economic loss rule applies only to negligence-based

tort claims); Hermansen v. Tasulis, 48 P.3d 235, 240 (Utah 2002) (expressly adopting

interpretation of economic loss rule that focuses on source of duties alleged to have been

breached and holding that "party suffering only economic loss from the breach of an express or

implied contractual duty may not assert a tort claim for such a breach absent an independent duty

of care under tort law.") (quoting Grynberg v. Agri Tech, Inc., 10 P.3d 1267, 1269 (Colo. 2000));

Town of Alma v. Azco Constr., Inc., 10 P.3d 1256, 1263 (Colo. 2000) (en banc).  The doctrine

applies to claims for intentional, as well as non-intentional, torts.  Grynberg, 70 P.3d at 13;

Hermansen, 48 P.3d at 240.

     The court finds the case of Associated Diving & Marine Contractors, L.C. v. Granite

Construction Company, No. 2:01-CV-330-DB, 2003 WL 25424908 (D. Utah July 11, 2003),

which applies the law of the cases cited above, to be particularly persuasive.  In Associated

Diving, the court dismissed all tort claims for events that occurred after the parties entered into

their legally binding contract (the court retained the breach of contract action and the cause of

action for fraud in the inducement because it occurred before the parties entered into their

contractual relationship).  The court held that those tort claims, which consisted of fraud,

negligent misrepresentation, fraudulent concealment, and fraudulent nondisclosure, were barred

---

[10]During the hearing, Dr. Anapoell briefly contended that Utah law does not necessarily
apply and so application of Utah's economic loss rule would be improper.  But he did not raise
that argument in his briefs.  Moreover, the Agreement's choice of law provision governs here
because the economic loss doctrine is based on policy originating in contract law.  Given that
Utah law governs the contract between the parties, the court finds that Utah's economic loss rule
is applicable to Dr. Anapoell's claims.

by the economic loss doctrine.  Id. at *3.  The court noted that,

> [j]uxtaposing [the plaintiff's] contract claims with its tort claims, it is clear that
> each of these claims allege breaches of the same duties.  Each of the tort claims
> challenged by [the defendant] allege a breach of a duty that is encompassed by the
> subject matter of the General Contract. . . . [I]t is clear that the duties alleged by
> [the plaintiff] in its tort claims are not independent of the parties' contract but are
> part and parcel of the defined rights, obligations and potential liabilities mutually
> agreed to by the parties.

Id. at *6.

In this case, all of Dr. Anapoell's allegations in his tort causes of action are "part and

parcel" of the rights set forth in the Agreement between him and the Defendants.  All of his

claims focus on the amount of insurance charges the Defendants billed under the Agreement (this

includes claim alleging misrepresentations, which arise out of the terms of the Insurance

Provision).  All of his damages (purely economic in nature) flow from Defendants' alleged

breach of the Insurance Provision.  And all of the alleged actions occurred after the Agreement

was executed by the parties.

> [O]nce a legally binding contract is agreed upon, the law recognizes that the
> parties to that agreement have forsaken the remedies provided in tort law and
> agreed rather to have their legal relationship governed by the obligations, duties,
> and remedies set out in the contract.  . . . .
>
> All of [the plaintiff's] damages flow from that alleged failure to [comply with the
> terms of the contract.] *How* [defendant] went about breaching that duty, whether
> by negligence, inadvertence, misunderstanding, concealment, or misrepresentation
> is not legally supportive of a separate legal duty sounding in tort.  *How*
> [defendant] accomplished the breach may be relevant to show that a breach
> occurred but because the harm . . . is fully covered by the contract, it does not give
> rise to an independent action in tort.

Id. (emphasis in original).

Because Dr. Anapoell alleges only economic losses and has not alleged a duty

13

independent of the Agreement, the economic loss doctrine bars his tort causes of action. Accordingly, the court dismisses the claims for intentional misrepresentation, fraudulent concealment, negligent misrepresentation, and conversion.

**The Utah Unfair Practices Act Claim**

In his Eighth Cause of Action, Dr. Anapoell generally alleges a violation of the Utah Unfair Practices Act (UPA) without any reference to specific statutory provisions (other than a provision allowing for treble damages). The UPA is found in the Utah statutory code §§ 13-5-1 to -18 (2005 & 2007 Supp.). The purpose of the UPA "is to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition, by prohibiting unfair and discriminatory practices by which fair and honest competition is destroyed or prevented." Utah Code Ann. § 13-5-17 (emphasis added). To further the purpose, the Utah State Legislature mandated that the UPA "shall be liberally construed that its beneficial purposes may be subserved." Id.

Any person "may maintain an action to enjoin a continuance of any act in violation of this chapter, and, if injured by the act, for the recovery of damages." Utah Code Ann. § 13-5-14. Dr. Anapoell seeks monetary damages, rather than injunctive relief, for the alleged violations of the UPA. (See First Am. Compl. ¶ 89 ("As a proximate result of Defendants' conduct as herein alleged, Plaintiff and class members have paid monies to Defendants to which they are not entitled, and have been damaged in an amount to be proven at trial"); ¶ 90 ("Plaintiff and the class members are entitled to treble damages in accordance with Utah Code Ann. § 13-5-14.").)

Although he alleges an injury, it is not the type of injury to competition contemplated by the UPA. The UPA is meant to compensate for an injury caused by a decrease in competition or

14

a discrimination in price.  See Burt v. Woolsulate, Inc., 146 P.2d 203, 205-06 (Utah 1944)

(describing genesis of UPA as tool to prevent reduction in competition or creation of monopolies

through, for example, price discrimination).

In Russell v. Lundberg, 120 P.3d 541 (Utah Ct. App. 2005), the Utah Court of Appeals

denied a UPA claim based on the absence of such an injury.  The plaintiffs in Russell alleged that

defendant Lundberg charged them more than his "actual costs and fees" associated with the

foreclosure work he performed for them.  See id. at 542 ("The Russells alleged that the Lundberg

defendants used various methods to artificially inflate costs and thereby unlawfully charge

foreclosees more than the actual costs of these various services.").  Although the court found that

the defendant did not actually charge the plaintiffs more than actual costs and fees, the court

observed that the claim did not fall within the confines of the UPA's prohibition on harming

competition: "If anything, Lundberg's alleged overcharging opened the door to competitors, who

could gain an advantage by offering a lower price than that charged by Lundberg."  Id. at 547.

Like the allegations in Russell v. Lundberg, Dr. Anapoell's allegations do not state a

claim under the UPA.  Nowhere does he allege price discrimination.  In fact, he alleges that all

potential class members were overcharged in the same manner.

Nor does he allege any harm to competition.  In his opposition to AmEx's motion, he

tries to fill in gaps left by his complaint by describing two direct injuries to competition.  Even

assuming these contentions were pleaded in the complaint, they do not help his case.

First, he says "because Defendants' insurance charge is a hidden fee (deriving substantial

profit to Defendants), Defendants' quoted lease price may be lower than the quoted price of a

competitor who is up-front with potential lessees about similar charges."  (Pl.'s Opp'n to

AmEx's Mem. Supp. Mot. at 16.)  But this argument does not make sense because the insurance charge was not mandatory.  The lessee was free to obtain his own insurance and avoid the Defendants' charges altogether.  There is no cogent connection between the lease price and the cost to obtain insurance.  And Plaintiff provides nothing but speculation about how Defendants' lease prices compare to their competitors' prices.

Second, he claims that AmEx is "selling insurance without the appropriate state insurance licenses.  Thus, [AmEx] has gained an unfair competitive advantage by selling insurance without having to comply with any state insurance regulations, while others engaged in the business of insurance must do so."  (Id. at 16-17.)  Dr. Anapoell does allege that "Defendants are also engaged in the business or sale of insurance without a license in violation of Utah Insurance Code."  (First. Am. Compl. ¶ 84.)  But this conclusory allegation is belied by the language of the Agreement, which simply states that the lessor may obtain insurance at the lessee's expense. Obtaining insurance is not the same as selling insurance.  Also, based on the allegations, the Defendants cannot be considered "insurers" or "sellers" of insurance, as defined in Utah Code Ann. §§ 31A-1-301(89), -301(149) (2007), because there is no allegation that the Defendants were acting on behalf of an insurance company, much less that they are insurance companies.[11] Furthermore, the conclusory allegation that the Defendants "gained an unfair competitive advantage by selling insurance without having to comply with any state insurance regulations,

_____

[11]Even if the court considers Dr. Anapoell's allegation in paragraph 84 of the complaint (that Defendants allegedly received "payments from insurance agents or insurance companies under the guise of reinsurance cessations, service fees, commissions or rebates"), the allegation is too vague and conclusory to sufficiently allege that the Defendants were "sellers of insurance" under the Utah Code.

while others engaged in the business of insurance must do so" still does not place Dr. Anapoell

or his monetary damages claim within the confines of the UPA as described above.

Overall, Dr. Anapoell characterizes the alleged conduct as "unfair" and unpersuasively

contends that the UPA prohibits either unfair or discriminatory practices.  (See Pl.'s Mem. Opp'n

AmEx's Mot. to Dismiss at 18 ("Requiring that a party, in order to establish a valid UPA claim,

prove that the challenged practice is both unfair and discriminatory (with respect to pricing), as

[AmEx] contends, is an unreasonable and contrary interpretation of the UPA.").)  Although the

UPA should be liberally construed, Dr. Anapoell's reading—that unfair but not discriminatory

practices are actionable under the UPA—goes far beyond a liberal construction.  Also, Dr.

Anapoell does not cite to any particular provision under the UPA, so the court is left to guess

exactly what provision he is relying on to make his claim.[12]

For the reasons stated above, the court dismisses Dr. Anapoell's claim under the Utah

Unfair Practices Act.[13]

---

[12]Dr. Anapoell also claims that his allegations "may form a sufficient cause of action for
violation of the UPA based on the 'cigarette rule.'  The cigarette rule arises out of the U.S.
Supreme Court's decision in FTC v. Sperry & Hutchinson Co., 405 U.S. 233 (1972).  There, the
Court held that under the Federal Trade Practice Act (the Federal equivalent to a state-enacted
Unfair Practices Act) an act may be deemed an unfair competitive practice if one of three criteria
are met. . . .  It does not appear that Utah Courts have addressed whether the cigarette rule applies
to a cause of action under the UPA. . . .  Adoption of the cigarette rule by this Court to find
Defendants' practices 'unfair' under the UPA is reasonable given that the '[UPA] shall be
liberally construed that its beneficial purposes may be subserved.' [Utah Code Ann.] § 13-5-
17[.]"  (Pl.'s Opp'n to AmEx's Mot. at 19.)  This court sits in diversity and is bound to apply the
UPA as it is interpreted by the Utah Supreme Court.  Given that the Utah Supreme Court has not
applied the "cigarette rule" when evaluating a UPA claim, this court declines Plaintiff's offer to
establish a new rule under Utah state law.

[13]Defendant Key Equipment Finance Inc. raises a preemption argument that the court
need not reach, given the other basis for dismissing the eighth cause of action.

**The UCC Claim**

Dr. Anapoell asserts a claim under Utah's Uniform Commercial Code § 70A-2a-218(5). That provision provides that "[t]he parties by agreement may determine that one or more parties have an obligation to obtain and pay for insurance covering the goods and by agreement may determine the beneficiary of the proceeds of the insurance."

Setting aside the question of whether Dr. Anapoell has even alleged a violation of the provision, the Agreement contractually bars the UCC Claim.[14]  The Agreement contains the following provision:

> **Lessee acknowledges that this Lease is intended to be a "finance lease" as defined in § 2A-103(1)(g) of the Uniform Commercial Code, as in effect in Utah ("UCC").  LESSEE WAIVES ANY AND ALL RIGHTS AND REMEDIES OTHERWISE GRANTED TO LESSEE BY UCC §§ 2a-508 THROUGH 2a-522.**

(Master Lease Agreement ¶ 9 (bold and capitalized emphases in original).)  Although Dr. Anapoell points out that § 70A-2A-218(5) is not listed in the above provision, the key is that any remedy available for a violation of that section would be found in UCC §§ 70A-2a-508 through 70A-2a-522.  And under the clear language of the Master Lease Agreement, those remedies are barred.  Accordingly, the court dismisses the UCC claim.

_____

[14]Even if the contractual bar of UCC claims did not exist, the allegations of the complaint do not allege any claim or injury cognizable under the UCC section cited by Dr. Anapoell.  Dr. Anapoell unpersuasively contends that "by charging its [sic] lessees more than its [sic] actual costs to obtain insurance, Defendants have . . . acted in a manner that is inconsistent with the <u>purpose</u> of § 70A-2a-218(5), which gives Defendants the right to administer their insurance program."  (Pl.'s Opp'n to Key's Mot. at 29 n.14 (emphasis added).)  The "purpose" of the section is to codify "the common practice of shifting responsibility and cost of insuring the goods between the parties to the lease transaction."  Utah Code Ann. § 70A-2a-218 cmt.  Dr. Anapoell reads too much into the straightforward language of the provision.  It does not state, or even imply, that a party to the lease transaction must only pass along the actual cost of the insurance.

**The California Business and Professions Code § 17200 Claim**

Dr. Anapoell alleges a violation of the California Business and Professions Code § 17200 et seq. ("§ 17200 Claim")[15] on behalf of a proposed sub-class of similarly-situated persons located in California.  The California Code provision is essentially an unfair competitive practices statute that is much broader than the Utah Unfair Practices Act.

The California statute, called the Unfair Competition Law (UCL), is independent of the California Unfair Practices Act.  <u>Cel-Tech Comms., Inc. v. L.A. Cellular Tel. Co.</u>, 973 P.2d 527, 539 (Cal. 1999).  Its remedies are cumulative of remedies available under, for example, the California UPA, although they are more limited.  <u>Id.</u> (allowing injunctive relief, restitution, and civil penalties, but not damages).  Still, the UCL's scope is broader than California's and Utah's UPA.

> Unlike the [California] Unfair Practices Act, it does not proscribe specific practices.  Rather, . . . it defines "unfair competition" to include <u>"any unlawful, unfair or fraudulent business act or practice." (§ 17200.)</u>  <u>Its coverage is sweeping,</u> embracing anything that can properly be called a business practice and that at the same time is forbidden by law.  <u>It governs anti-competitive business practices as well as injuries to consumers</u>, and has a major purpose of the preservation of fair business competition.  By proscribing "any unlawful" business practice, <u>section 17200 borrows violations of other laws</u> and treats them as unlawful practices that the unfair competition law makes independently actionable.
>
> <u>However, the law does more than just borrow.</u>  The statutory language referring to "any unlawful, unfair *or* fraudulent" practice . . . makes clear that a practice may be deemed unfair even if not specifically proscribed by some other law.  <u>Because</u>

---

[15]The provision cited by Dr. Anapoell is located in the Business and Professions Code Part 2, which is titled "Preservation and Regulation of Competition."  In the "Enforcement" chapter of Part 2, § 17200 prohibits unfair competition, which is defined as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code [relating to false advertising]."  Cal. Bus. & Prof. Code § 17200.

. . . section 17200 is written in the disjunctive, it establishes **three varieties of unfair competition** – acts or practices which are unlawful, **or** unfair, **or** fraudulent.  In other words, a practice is prohibited as unfair or deceptive even if not unlawful and vice versa.

The unfair competition law . . . has a broader scope for a reason. . . . [T]he section was intentionally framed in its broad, sweeping language, precisely to enable judicial tribunals to deal with the innumerable new schemes which the fertility of man's invention would contrive.

Id. at 539-40 (internal citations and quotation marks omitted) (emphasis added).

In his complaint, Dr. Anapoell essentially alleges all three bases for claims under

§ 17200—that is, that Defendants engaged in unlawful, unfair, and fraudulent business acts or

practices.  (See First Am. Compl. ¶¶ 97-110.)

The Defendants contend that the choice of law provision in the Agreement precludes

reliance on the California statute.  That provision reads, in relevant part, that "this Master Lease

Agreement and each Lease shall be deemed entered into and performed in Salt Lake County,

Utah.  EACH LEASE SHALL BE GOVERNED BY THE LAWS OF UTAH, WITHOUT

REGARD TO ITS PRINCIPLES OF CONFLICTS OF LAW OR CHOICE OF LAW."  (Master

Lease Agreement ¶ 16 (emphasis in original).)

The provision is valid,[16] so if it is interpreted broadly enough to include the unfair

competition claim under the California statute, the cause of action is precluded.  But the court is

not convinced that the choice of law provision applies to an unfair competition claim.  The

language says that "each lease shall be governed by the laws of Utah."  Arguably, this language

---

[16]The federal court in California that transferred this case to Utah did so based on its finding that the venue clause, which immediately followed the choice of law language in Paragraph 16 of the Master Lease Agreement, was valid and enforceable.

does not extend to claims alleging duties outside the Agreement.  There is no "arising out of" language that would extend the provision's reach beyond the lease.  Accordingly, the court finds that it must determine whether the California Unfair Competition Law (UCL) conflicts with Utah law.  See also Texas Taco Cabana, L.P. v. Taco Cabana of New Mexico, Inc., 304 F. Supp. 2d 903, 908 (W.D. Tex. 2003) (holding that franchise agreement's choice of law provision, which stated that the agreement "shall be construed under the laws" of Texas, was not broad enough to preclude a claim for violation of New Mexico Unfair Practices Act).

Because this court is exercising its diversity jurisdiction, it must apply the choice of law rules of Utah, the forum in which it sits.  Clark v. State Farm Mut. Auto. Ins. Co., 433 F.3d 703, 709 (10th Cir. 2005); Electrical Distr., Inc. v. SFR, Inc., 166 F.3d 1074, 1083 (10th Cir. 1999).

In Utah, the courts first determine whether a conflict of law exists.  St. Paul Fire & Marine Ins. v. Commercial Union Assur., 606 P.2d 1206, 1208 n.1 (Utah 1980); Littlefield v. Mobil Exploration & Producing, N. Amer., Inc., 988 F. Supp. 1403, 1407 (D. Utah 1996).  A conflict exists if the outcome would differ depending on which state's law is applied or if the forum state does not recognize the cause of action asserted in the complaint.  See Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 838 n.20 (1985); Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 498 (1941) ("Nothing in the Constitution ensures unlimited extraterritorial recognition of all statutes or of any statute under all circumstances."); Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 81 (2d Cir. 2002) (holding that actual conflict existed when only one of two states recognized particular tort remedy); Gulf Group Holdings, Inc. v. Coast Asset Mgmt. Corp., __ F. Supp. 2d __, 2007 WL 496733 (S.D. Fla. Feb. 13, 2007) ("California law does not automatically apply to this claim merely because Florida law does not recognize the

cause of action.  Rather, a choice of law analysis must be conducted to determine which state's law applies to the claim.") (citing Klaxon)).  Here, there is a conflict between the California UCL and the Utah UPA because the California statute is much broader and there is no equivalent statute in Utah.

When a conflict exists, the court applies the "most significant relationship" test from the Restatement (Second) of Conflict of Laws to determine which law to apply.  Waddoups v. Amalgamated Sugar Co., 54 P.3d 1054, 1059 (Utah 2002).  In the case of an action akin to tort (as opposed to contract), the Utah courts apply the principles set forth in Restatement (Second) of Conflicts of Law § 145 (1971).  Id. at 1059-60 (noting that contract causes of action are governed by the Restatement's § 188).  The cause of action Dr. Anapoell alleges under the California UCL sounds more in tort than contract, as does his claim under the Utah UPA.  See, e.g., Texas Taco Cabana, 304 F. Supp. 2d at 908 (applying § 145 to determine which state's unfair practices act applied); Nicholson v. Marine Corps W. Fed. Credit Union, 953 F. Supp. 1012, 1016 (N.D. Ill. 1997) (applying § 145 to determine whether Illinois law applied and, if so, whether it precluded application of California Code § 17200); Fleet Mgmt. Sys., Inc. v. Archer-Daniels-Midland Co., Inc., 627 F. Supp. 550, 563 (C.D. Ill. 1986) (applying § 145 to determine whether Massachusetts' unfair competition statute applied).

Accordingly, this court will consider the four factors in § 145(2) of the Restatement (Second) of Conflict of Laws: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered."  Other factors the court must consider (at least to the extent they are relevant)

22

are listed in § 6(2) of the Restatement.  See Restatement (Second) Conflict of Laws § 145(1)

(incorporating Restatement § 6); Waddoups, 54 P.3d at 1060.  Those factors are: "(a) the needs

of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant

policies of other interested states and the relative interests of those states in the determination of

the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying

the particular field of law, (f) certainty, predictability, and uniformity of result, and (g) ease in the

determination and application of the law to be applied."[17]

    In this case, the injury occurred in California.  But because of the nature of the injury

(monetary) and the nature of the claims (e.g., unfair competition, fraudulent misrepresentation),

the place of the alleged conduct carries more weight.

> When the injury occurred in two or more states, or when the place of injury cannot
> be ascertained or is fortuitous and, with respect to the particular issue, bears little
> relation to the occurrence and the parties, the place where the defendant's conduct
> occurred will usually be given particular weight in determining the state of
> applicable law.
>
> . . .
>
> The relative importance of the contacts mentioned above varies somewhat with
> the nature of the tort involved.  Thus, the place of injury is of particular
> importance in the case of personal injuries and of injuries to tangible things. . . .
> On the other hand, the place of injury is less significant in the case of fraudulent
> misrepresentations . . . and of such unfair competition as consists of false
> advertising and the misappropriation of trade values.

Restatement (Second) Conflict of Laws § 145 cmts. e, f (emphasis added).

    In this case, the place of the alleged conduct is Utah, as shown by the allegations and by

---

[17]The court finds that the factors concerning "the needs of the interstate and international
systems" and "the ease in the determination and application of the law to be applied" are not
particularly relevant or helpful to the analysis in this case.

operation of the Agreement.  The Agreement, out of which Dr. Anapoell's causes of action arise, expressly states that "this Master Lease Agreement and each Lease <u>shall be deemed</u> entered into and <u>performed in Salt Lake County, Utah</u>." (Master Lease Agreement ¶ 16 (emphasis added).) This language also supports a finding that the fourth factor ("the place where the relationship between the parties is centered") weighs in favor of Utah.  Moreover, the parties expressly agreed that the venue for resolving disputes would be in Utah.  Applying Utah law to the non-contract claims would be consistent with the parties' expectations expressed in the Agreement, which is a factor ("the protection of justified expectations")[18] to be considered under § 6(2) of the Restatement.  All of these facts weigh in favor of applying Utah law.

The third factor ("the domicil, residence, nationality, place of incorporation and place of business of the parties") does not weigh in favor of either state.  AmEx is a Utah corporation, Dr. Anapoell is a resident of California, and Key is a Michigan corporation.

Both states have an interest in the case and generally promote the policy of consumer protection.  California has an interest in protecting its residents, such as Dr. Anapoell, from the activity barred in the California UCL.  And Utah has an interest in choosing the scope of unfair business practices for which a person is liable in its state, and, by the same token, protecting its residents from extraterritorial effect of statutes for which Utah has no counterpart.

Finally, applying Utah law to conduct occurring in Utah would advance certainty,

---

[18]"Generally speaking, it would be unfair and improper to hold a person liable under the local law of one state when he had justifiably molded his conduct to conform to the requirements of another state.  Also, it is in part because of this factor [protection of justified expectations] that the parties are free within broad limits to choose the law to govern the validity of their contract . . . ."  Restatement (Second) Conflict of Laws § 6 cmt. g.

predictability and uniformity of result (factor (2)(f) under § 6 of the Restatement), particularly when the Defendants engage in similar lease transactions in many different states.

Balancing all of the above, the court finds that Utah has the most significant relationship to the action and so Utah law should be applied to the conduct alleged in the complaint.

Dr. Anapoell has alleged a claim under the UPA <u>and</u> the California Code.[19]  He cannot have it both ways.[20]  Dr. Anapoell is limited to a claim under the UPA, not California UCL § 17200 et seq.  <u>See, e.g.</u>, <u>Nicholson v. Marine Corps W. Fed. Credit Union</u>, 953 F. Supp. 1012, 1017 (N.D. Ill. 1997) (finding Illinois, rather than California, had most significant relationship to action, and because Illinois law applied, court could not grant relief under California Code § 17200); <u>Becker v. Computer Sciences Corp.</u>, 541 F. Supp. 694, 703-06 (S.D. Tex. 1982) (applying same analysis to determine that Texas had more significant relationship to action than California, and holding that granting leave to add California cause of action to complaint would be futile because Texas did not recognize cause of action).

For the foregoing reasons, the court dismisses Dr. Anapoell's § 17200 Claim.

## ORDER

For the reasons set forth above, the court ORDERS as follows:

1.    American Express Business Finance Corporation's Motion to Dismiss (Docket # 31) is GRANTED, with one exception.  The Plaintiff's claims for Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing are DISMISSED WITHOUT

---

[19]Although Dr. Anapoell asserts the claim on behalf of similarly situated California residents, that proposed sub-class has not been certified.

[20]Despite his suggestion otherwise, pleading in the alternative does not allow Dr. Anapoell to escape dismissal once a motion to dismiss has been filed.

PREJUDICE.  The remaining claims are DISMISSED WITH PREJUDICE.

      2.      Key Equipment Finance, Inc.'s Motion to Dismiss (Docket # 29) is GRANTED, with one exception.  The Plaintiff's claims for Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing are DISMISSED WITHOUT PREJUDICE.  The remaining claims are DISMISSED WITH PREJUDICE.

      3.      The court GRANTS PLAINTIFF LEAVE TO FILE A MOTION TO AMEND his complaint only as to the breach of contract and breach of the implied covenant of good faith and fair dealing claims.  **Failure to file a motion for leave to amend within 30 days from the date of this Order will result in dismissal with prejudice of the contract claims.**

      4.      American Express Business Finance Corporation's request to strike the Plaintiff's request for jury trial is DENIED WITHOUT PREJUDICE.

      DATED this 29th day of November, 2007.

                      BY THE COURT:

                      TENA CAMPBELL
                      Chief Judge